**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

**GUARDIAN FIBERGLASS, INC., a Delaware**                **PLAINTIFFS**
**Corporation, and GUARDIAN FIBERGLASS**
**SERVICE CORPORATION, a Delaware corporation**

**v.**                **NO. 4:05-CV-00463 GTE**

**WHIT DAVIS LUMBER COMPANY, an**
**Arkansas Corporation**                **DEFENDANT**

## ORDER GRANTING PARTIAL SUMMARY JUDGMENT

Before the Court are Cross-Motions for Summary Judgment.  Defendant Whit Davis

Lumber Company ("Whit Davis") has filed a Motion for Summary Judgment.  Plaintiffs

Guardian Fiberglass, Inc. and Guardian Fiberglass Service Corporation (collectively "Guardian")

responded and filed a Counter-Motion for Partial Summary Judgment.  The motions have been

fully briefed and the Court is prepared to rule.

Whit Davis moves for summary judgment challenging the enforceability a restrictive

covenant preventing Whit Davis from providing insulation installation services for a period of

two years following the termination of the exclusive supplier agreement between the parties.

Guardian moves for summary judgment contending that Whit Davis breached its contractual

obligation to purchase fiberglass insulation exclusively from Guardian during the contract term.

For the reasons stated herein, the Court concludes that both parties are entitled to judgment as a

matter of law:  the post-termination restrictive covenant is unenforceable, but Whit Davis is

1

liable for a sum to be determined for purchasing fiberglass insulation from non-Guardian sources

prior the contract's expiration.

## FACTS WITHOUT MATERIAL CONTROVERSY

The Court is very familiar with the facts in this case, having presided over a hearing for

two days in May of 2005 for the purpose of considering Guardian's Motion for Preliminary

Injunction.  The following is not intended to detail all the facts referenced by the parties in their

respective pleadings, some of which are not material to the Court's decision.  The Court focuses

on those facts necessary to inform its decision here, but has considered all the facts recited by the

parties in their respective statements of material fact.

Plaintiff Guardian Fiberglass, Inc. manufactures and distributes fiberglass insulation

products.  Plaintiff Guardian Fiberglass Service Corporation is the administrator of the various

programs through which Guardian Fiberglass, Inc.'s products are manufactured.  Both entities

will be referred to hereafter collectively as "Guardian."  Guardian ranks fourth in the national

market for insulation product sales, behind Owens-Corning, CertainTeed and Johns Manville.

Whit Davis has been in business since 1950.  At present, it operates two lumber yards and

retail stores in central Arkansas, one in Cabot and one in Jacksonville.[1]   The Jacksonville store

employs approximately 60 people; the Cabot store employs approximately 40 people.  Whit

Davis relies on outside salesmen to solicit business from builders.  Prior to its relationship with

Guardian, Whit Davis sold insulation but did not sell insulation installation services to its client

base of builders.

---

[1] In a summary judgment brief submitted in December of 2005, Whit Davis indicated
that it was constructing a third store in Greenbrier, Arkansas.  The Court does not know whether
that store is operational yet.

2

In 1995, Guardian launched its "Dealer Installed Insulation Program" ("Dealer Program").  The program was designed to create a new market for Guardian's products by targeting lumber yards selling insulation at retail and assisting them to become insulation installers.

In October 1997, representative of Guardian and Whit Davis met at a trade show and discussed Guardian's Dealer Program.  At that time, Whit Davis was selling insulation and other building products at its retail facilities, but was not engaged in the business of insulation installation.

After the trade show, Dan Ohmer, Guardian's Director of Sales, traveled to Arkansas where he met with Whit Davis' representatives John Davis (CEO), Don Millar (a manager) and Terry Toney (general manager) and presented Guardian's Dealer Program.  As part of the presentation, Mr. Ohmer provided Whit Davis with a notebook entitled "Opportunity Plus."  The notebook provided an abundance of information about installed insulation sales, including an analysis of the fiberglass insulation market opportunity, extensive product information, specifications and other information about trucks and equipment, staffing, compensation and incentive programs and list of current dealers.  This notebook was given to Whit Davis before any contract was signed and without any restrictions on its use regardless of whether Whit Davis elected to sign a contract with Guardian.

Whit Davis' volume of business, and its new housing starts in particular, made it an attractive candidate for Guardian's Dealer Program.  In 1998, Guardian "pre qualified" dealers like Whit Davis.  For a dealer to be "pre-qualified," the dealer had to already be selling 100 housing packages per year.  Guardian had pre-qualified Whit Davis prior to soliciting its

business.  Guardian had also determined that Whit Davis was among those lumber yards located in a geographic area in which Guardian was likely to be able to establish a "*competitive footprint*"[2] in the market.

Owens Corning, the largest fiberglass insulation manufacturer in the country, also presented its installed dealer program to Whit Davis.  Whit Davis determined that Guardian's program was better and elected to begin an insulation installation program with Gaurdian.

In March 1998, Whit Davis entered into a One-Year Trial Agreement ("Trial Agreement") with Guardian in order to evaluate the Dealer Program.  The Trial Agreement's provisions included the following terms:

> 2.    <u>Post-Termination Restriction</u>.  In the event (i) Customer does not elect to enter into a Continuous Agreement with Supplier and Service Corp. or (ii) this Agreement is terminated by Supplier and/or Service Corp. as a result of any default by Customer, Customer and its officers, directors, shareholders, partners, owners, principals and other affiliates agree not to directly or indirectly provide Installation Services or own, manage, operate, assist, train or advise any person or entity which provides Installation Services for a period of two (2) years following the expiration of the Term.

> 3.    <u>Appointment of Exclusive Supplier</u>.  During the Term, Customer agrees to exclusively utilize Insulation Products that are manufactured by or for Supplier both for sale at retail at the Designated Location and to purchase such Insulation Products only from distributors authorizes by Supplier.

(Trial Agreement, Exh. 11 to Pl.'s Response, Doc. No. 40).

On Whit Davis' behalf, John Davis signed the Trial Agreement with full awareness of the noncompete provision.  He did not discuss or attempt to negotiate the provision with Mr. Ohmer prior to entering into the Trial Agreement.

---

[2]  Guardian uses the phrase "*competitive footprint*" throughout its briefing.  As best the Court can tell, it means nothing more than a competitive advantage or market share.

In April of 1998, Guardian sent a representative, Bob Rountree, to Whit Davis' facility for a week of training.  Guardian also provided computer software and hardware, a truck, an insulation blowing machine, a computer, a copy of Guardian's proprietary estimating, inventory, and invoicing software, advertising materials, and various tools and start-up supplies.   Guardian also made available various incentive programs that enhanced the success of the Dealer Program. The one year trial period proved successful for both parties, and Whit Davis advised that it wished to continue its participation in the Dealer Program.

On April 27, 1999, Guardian and Whit Davis entered into a Retail Assistance and Supply Agreement ("the Agreement").  (Exh. 12 to Pl.'s Response, Doc. No. 40).  The Agreement was for an initial three year term, and thereafter provided for automatic and indefinite extensions until one of the parties elected to terminate the Agreement.  The Agreement includes a voluntary termination provision, pursuant to which either party may terminate the Agreement by providing the other with ninety (90) days' written notice.  The Agreement also contains exclusivity and post-termination restriction provisions, the terms of which are nearly identical to the Trial Agreement and state:

> 3.    Appointment of Exclusive Supplier.  During the Term of this Agreement, Customer agrees to exclusively stock and utilize Insulation Products manufactured by or for Supplier for both retail sales at the Designated Locations and for the provision of Installation Services from the Designated Locations and to purchase such Insulation Products only from distributors authorized by Supplier.
>
> . . .
>
> 8.    Post-Termination Restriction.  In the event this Agreement is voluntarily terminated by Customer pursuant to Section 2 above or is terminated by Supplier and/or Service Corp. as a result of an Event of Default, for a period of two (2) years following such termination of this Agreement Customer and its  officers, directors, shareholders, partners, owners, principals and other affiliates agree not to directly or indirectly provide

Installation Services or own, manage, operate, assist, train or advise any person or entity which provides Installation Services.

(Agreement, Exh. 12 to Pl.'s Response, Doc. No. 40).

Under the terms of the Agreement, Whit Davis had the right to voluntarily terminate the Agreement for any reason with ninety (90) days' notice, but doing so would trigger a two year period during which Whit Davis would be precluded from engaging in the "insulation installation" business. The two year post-termination restriction applied in perpetuity, that is regardless of how long Whit Davis purchased product from Guardian exclusively, and did not permit Whit Davis to "buy back" the right to install insulation sooner than two years.[3]

Whit Davis purchased fiberglass insulation products exclusively from Guardian from 1998 until mid-January 2004. During this time, Whit Davis purchased approximately $2.2 million of insulation products. Based on Guardian's stated forty percent (40 %) profit margin, Whit Davis' purchases would have generated approximately $1 million in profit for Guardian.

Whit Davis began purchasing fiberglass insulation products from Johns Manville, a Guardian competitor, in mid-January 2004. It is undisputed that this action violated the letter of the Exclusive Supplier provision, but Whit Davis contends that the provision had been rendered unenforceable by Guardian's earlier agreement to allow Whit Davis to purchase and install cellulose insulation.

On or about January 23, 2004, Dan Hickey faxed a copy of the Agreement to Terry Toney

---

[3] In at least one of its other dealer contracts, Guardian agreed to a provision whereby the dealer could pay a termination fee of $30,000 if it canceled the agreement after the first year and continue installing insulation. The same contract provided that if the dealer purchased from Guardian for five years, the post-termination provision would not apply. This modification suggests that Guardian considers the need for this type of protection to be earliest in the early stages of such business relationship.

and told him that the Agreement prevented Whit Davis from stocking or selling any other manufacturer's insulation.  In early February 2004, Whit Davis advised Guardian of its position that the covenant not to compete was unenforceable and that Whit Davis would continue to purchase from JM.  Whit Davis also continued to purchase UltraFit from Guardian until some time in March of 2004, when Guardian advised that it would no longer sell UltraFit to Whit Davis.

Guardian sued to enforce the restrictive covenant on November 23, 2004 in the United States District Court for the Western District of Michigan.  On March 1, 2005, the Michigan District Court transferred the case to the Eastern District of Arkansas.  The transfer was precipitated by the Michigan's court conclusion that it lacked personal jurisdiction over Whit Davis.

This Court conducted a hearing on May 4 and 5, 2005, for the purpose of considering Guardian's Motion for Preliminary Injunction.  The Court, ruling from the bench at the conclusion of the hearing, denied the motion.  In its ruling, the Court expressed concern regarding Guardian's ability to demonstrate a legitimate business interest sufficient to justify the restrictive covenant.

Both parties have moved for summary judgment.  Whit Davis filed its motion first. Therein, Whit Davis contends that the restrictive covenant is unenforceable.  Whit Davis further contends that Guardian is not entitled to any damages as a result of Whit Davis' alleged failure to provide 90 days' written notice of its intent to terminate the Agreement.  Guardian responded and counter-moved for summary judgment.  Guardian contends that it is entitled to a determination as a matter of law that Whit Davis breached the exclusivity provision and that the enforceability of

7

the restrictive covenant involves disputed issues of fact, prohibiting a ruling as a matter of law.

Guardian also contends that the damages for both the breach of the restrictive covenant and the

exclusivity provision involve disputed issues of fact.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when, in reviewing the evidence in the light most

favorable to the non-moving party, there is no genuine issue as to any material fact, so that the

dispute may be decided solely on legal grounds. *Holloway v. Lockhart*, 813 F.2d 874 (8th Cir.

1987);  Fed. R. Civ. P. 56.  The Supreme Court has established guidelines to assist trial courts in

determining whether this standard has been met:

> The inquiry performed is the threshold inquiry of determining whether there is a need for
> trial-- whether, in other words, there are genuine factual issues that properly can be
> resolved only by a finder of fact because they may reasonably be resolved in favor of
> either party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

The Eighth Circuit set out the burdens of the parties in connection with a summary

judgment motion in *Counts v. M.K. Ferguson Co.*, 862 F.2d 1338 (8th Cir. 1988):

> [T]he burden on the party moving for summary judgment is only to
> demonstrate, i.e., '[to] point[] out to the District Court,' that the record
> does not disclose a genuine dispute on a material fact.  It is enough for the
> movant to bring up the fact that the record does not contain such an issue
> and to identify that part of the record which bears out his assertion.  Once
> this is done, his burden is discharged, and, if the record in fact bears out
> the claim that no genuine dispute exists on any material fact, it is then the
> respondent's burden to set forth affirmative evidence, specific facts,
> showing that there is a genuine dispute on that issue.  If the respondent
> fails to carry that burden, summary judgment should be granted.

*Id*. at 1339 (quoting *City of Mt. Pleasant v. Associated Elec. Coop.*, 838 F.2d 268, 273-74 (8th

Cir. 1988) (citations omitted)(brackets in original)).

"A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  However, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim.  *Id*.

Once the moving party demonstrates that the record does not disclose a genuine dispute on a material fact, the non-moving party may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. Rule 56(e).  The plain language of Rule 56(c) mandates the entry of summary judgment against a non-moving party which, after adequate time for discovery, fails to make a showing sufficient to establish the existence of an element essential to its case, and on which that party will bear the burden of proof at trial.  *Celotex Corp.*, 477 U.S. at 322.

## DISCUSSION

For the reasons stated herein, the Court concludes that it will apply Michigan law, that the restrictive covenant is unreasonable and unenforceable, and that Whit Davis' action of purchasing insulation from Johns Manville beginning in January of 2004 violated the Agreement's exclusivity provision.

### A.      Choice of Law Determination

Before taking up the issue of whether the restrictive covenant is enforceable, the Court must determine whether Michigan or Arkansas law should apply.  The Agreement provides that: "The validity, construction, and enforcement of, and the remedies under this Agreement will be

9

governed in accordance with the laws of Michigan." (Agreement at ¶ 12(A), p. 3).

At the conclusion of the preliminary injunction hearing, the Court discussed the issue of whether Michigan law, as chosen in the contract, or Arkansas law, the controlling law absent the contractual choice of law provision, would apply to determine the enforceability of the anti-competitive covenant. The Court concluded that Michigan's connection to the contract was sufficient to warrant application of Michigan law unless such application would be contrary to a fundamental policy of Arkansas, the state with a materially greater interest in the transaction. *See* Restatement (Second) of Conflicts, § 187;  *See also*, *Britelink v. Telcorp*, Case no. 3:03-CV-00207 GTE (E.D. Ark., Docket No. 26, May 7, 2004) (this Court's prior opinion discussing a contractual choice of law provision and fundamental policy exception).

A copy of the *Britelink* opinion was provided to counsel at the conclusion of the preliminary injunction hearing. The opinion sets out in considerable detail the conflicts principles to be applied in connection with a contractual choice of law provision and the Restatement (Second) of Conflicts § 187(2)'s fundamental policy exception to application of the parties' chosen law. The Court will not repeat that analysis here, but starts with the premise, as it did when the preliminary injunction hearing concluded, that Michigan's connections to the Agreement are substantial enough that Michigan law should apply unless application of the Restatement's fundamental policy exception would require that Arkansas law be applied instead on this particular issue.[4]

The fundamental policy exception is triggered if:

---

[4] The fundamental policy exception is being applied solely to the dispute regarding the restrictive covenant's enforceability. Michigan law clearly applies to govern the parties' other contractually based disputes.

10

> application of the law of the chosen state [Michigan] would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

Restatement 2d Conflicts, § 187(2)(b).

Guardian argues that the laws of the two states are substantially similar such that there is no need to consider the fundamental policy exception (in which case Michigan law applies). Guardian correctly notes that this Court had initially considered whether "there may be no need to deal directly with the fundamental policy exception" due to the similarity between the two states' laws on this issue.[5]  The Court starts here because if there is a false conflict – that is, if under the laws of either Arkansas and Michigan the covenant would not be enforceable – then it would be unnecessary (and, arguably, error) to apply the fundamental policy exception to displace the law chosen by the parties.

The Court starts by comparing the two states' approaches to restrictive covenants. In Michigan, a restraint is enforceable if it is for a just and honest purpose, protects a legitimate business interest, is reasonable between the parties, and is not injurious to the public. *Bristol Window & Door v. Hoogenstyn*, 250 Mich. App. 478, 487, 650 N.W.2d 670 (2002).  In the employer-employee context, Michigan has enacted a statute which specifically authorizes covenants to protect an employer's "reasonable competitive business interests" and which "expressly prohibits an employee from engaging in employment or a line of business after termination of employment if the agreement or covenant is reasonable as to its duration, geographical area, and the type of employment or line of business."  MCL 445.774a.  While the

---

[5]  (Preliminary Inj. Hearing Transcript, Def.'s Exh. 1 at pp. 425-26).

statute by its terms is intended to apply only to covenants not to compete between employers and employees, it has also been described as "a codification of the common law on noncompete agreements." *Bristol*, 250 Mich. App. at 486.  By statute and common law, Michigan courts have the equitable power to "blue-line" or re-write an unreasonably restrictive covenant to make it reasonable.  MCL 445.774a provides "To the extent any such agreement or covenant is found to be unreasonable in any respect, a court may limit the agreement to render it reasonable in light of the circumstances in which it was made and specifically enforce the agreement as limited." It is undisputed that Michigan courts have this equitable power at common law regardless of whether an employer-employee covenant is involved.  Furthermore, a court applying Michigan law is permitted, but not required to rewrite an unreasonable covenant.  *A Complete Home Care Agency, Inc. v. Guttierez*, 2004 WL 1450450 (Mich. App.).

In Arkansas, a restrictive covenant will only be enforced if three requirements are met: "(1) the covenantee must have a valid interest to protect; (2) the geographical restriction must not be overly broad; and (3) a reasonable time limit must be imposed." *Moore v. Midwest Distribution, Inc.*, 76 Ark. App. 397, 401, 65 S.W.3d 490, 493 (Ark. App. 2002).   In Arkansas, "a contract must be valid as written, and the court will not apportion or enforce a contract to the extent that it might be considered reasonable." *Bendinger v. Marshaltown Trowell Co.*, 338 Ark. 410, 419, 994 S.W.2d 468 (1999).

It does indeed appear – and the parties appear to agree on this point – that the primary difference in the laws of the two states is that Michigan law permits (but does not require) a court to use its equitable powers to "blue-line" (or rewrite) an unreasonably restrictive covenant in order to make it reasonable while Arkansas law does not.

On January 27, 2006, Whit Davis filed a supplemental brief calling to the Court's attention the case of *DCS Sanitation Management, Inc. v. Castillo*, 435 F.3d 892 (8th Cir. 2006)(decided January 25, 2006).  Whit Davis contends that the precedent established by the *Castillo* case is controlling on the choice of law issue presented here.

In *Castillo*, a district court in Nebraska was confronted with a covenant not to compete in an employment agreement.  Although the contract was entered into and performed in Nebraska and the former employees to be restricted lived in Nebraska, the contract's choice of law provision adopted the law of Ohio, the location of the employer's principal place of business. *Id.*, 435 F.3d at 894, 896.  The differences between Ohio and Nebraska law in the *Castillo* case are analogous to the differences between Michigan and Arkansas law in this case.[6]  Ohio, like Michigan, empowers courts "to reform overly broad or unreasonable noncompete agreements to make them reasonable."  *Id.*, at 897.  Nebraska, like Arkansas, prohibits a court from reforming an unreasonable and invalid covenant to make it reasonable and enforceable.  *Id.*  The district court refused to apply Ohio law, based on its finding that Nebraska's interest in the noncompete agreements at issue was materially greater than Ohio's and that application of Ohio law would violate a fundamental policy of Nebraska law.  *Id.*, at 895.  The Eighth Circuit agreed, following a *de novo* review and in-depth analysis pursuant to the Restatement (Second) of Conflicts § 187.[7] *Id.*, 895-98.

Guardian contends that *DCS* is not controlling here because it concerned a restrictive

---

[6]  That circumstance and the Eighth Circuit's analysis under § 187 of the Restatement, the same analysis applicable here, make the *Castillo* case persuasive authority.

[7]  All Restatement references hereinafter, unless otherwise stated, are to the Restatement (Second) of Conflicts.

covenant in an employer-employee situation and because Ohio lacked a substantial connection to the contract in question.  The Court addresses, *infra*, the significance of the employer-employee context in evaluating covenants not to compete.   Suffice it to say that such circumstance in no way undermines the persuasiveness of the *DCS* Court's applicability of the Restatement of Conflicts § 187(2) fundamental policy exception and its holding to displace the parties' choice of law with the law of the forum state.

The Court remains concerned, however, about the false conflict issue.  The *Castillo* case, while persuasive, is arguably distinguishable.  If – under either Arkansas or Michigan law – an anti-competitive post-termination covenant fails to protect a legitimate business interest, then it will not be enforced.  The Court does not believe that a Michigan court would undertake to blue-line or modify a covenant in order to create a legitimate business interest.  In other words, while a Michigan court might use its equitable reformation powers to shorten an unreasonable term or to supply a reasonable geographic restriction where none otherwise existed, it could not use its discretionary power to supply a missing legitimate business interest.   Because the Court concludes that Guardian's legitimate business interest does not justify the covenant in question, there is no occasion to continue the analysis to consider whether the covenant might be otherwise modified to be made enforceable.  Under the circumstances of this particular case, the conflict is a false one and the fundamental policy exception need not be applied.  The Court will apply Michigan law to the post-termination covenant not to compete.

Alternatively, if Guardian were deemed to have a legitimate business interest in the covenant at issue in this case, then the Court, following the holding in *Castillo,* would apply the fundamental policy exception, in which case it would conclude that Arkansas law should apply.

14

Arkansas has a materially greater interest in the restrictive covenant at issue in this case.

Additionally, Michigan's approval of equitable reformation, permitting courts to modify terms or

even to supply omitted restrictions in order to make unreasonable covenants reasonable would

violate a fundamental policy of the state of Arkansas.  If Arkansas law were applied, then the

covenant would not be enforced because  it is unlimited in geographic scope and its terms are

overbroad in that it prohibits Whit Davis from installing all types of insulation, even non-

fiberglass insulation such as cellulose or foam, which Guardian does not even manufacture.  *See*

*Federated Mutual Insurance Co. v. Bennet*, 36 Ark. App. 99, 818 S.W.596, 597-98

(1991)(holding void as overbroad a covenant that purported to prevent a former insurance sales

representative from selling even those types of policies the former employer did not sell).

The Court continues its analysis, applying Michigan law for the reasons earlier stated.

### **Issue of Law for the Court**

Guardian suggests that a jury, not the Court, should resolve any factual issues regarding

whether it has a legitimate competitive business interest to protect.  Guardian offers no authority

for this proposition.  The Court rejects it.   "Whether a restrictive covenant is reasonable and

enforceable is a question of law."  *Baxter Int'l, Inc. v. Morris*, 976 F.2d 1189, 1197 (8th Cir.

1992)(applying Illinois law to determine a restrictive covenant's enforceability); *See also*

*Stubblefield v. Siloam Springs Newspapers, Inc.*, 590 F.Supp. 1032 (W.D. Ark. 1984)(Judge

Waters *sua sponte* raised and resolved the issue of whether a ten year covenant not to compete

associated with the sale of a business was void as against public policy).

Whether a covenant not to compete is enforceable between two contracting parties, is,

this Court believes, a question of law for the Court.  Such determination necessarily involves the

15

interpretation of a contract and the identification and application of public policy considerations.

A court, not a jury, should make such determination. Certainly, the threshold issue of whether a

legitimate business interest justifies the covenant is normally a question of law. While a case

might arise in which a jury would be called upon to resolve a material fact, the resolution of

which is necessary for the Court to apply the law and determine a covenant's enforceability, such

is not the case here. Guardian has had the opportunity – and the obligation – to come forward

with any and all evidence which it contends supports its position that the covenant should be

enforced. The Court finds that Guardian has failed to create a disputed issue of material fact

relevant to the restrictive covenant's enforceability. The issue is therefore one of law for the

Court.

### Review of the Covenant not to Compete

Under Michigan common law, "the enforceability of noncompetition agreements depends

on their reasonableness." *Bristol Window and Door, Inc. v. Hoogenstyn*, 250 Mich. App. 478,

495, 650 N.W.2d 670, 679 (Mich. App. 2002). The test for reasonableness is well established in

Michigan, having been articulated over a century ago as follows:

> But if, considered with reference to the situation, business and objects of the parties, and
> in the light of all the surrounding circumstances with reference to which the contract was
> made, the restraint contracted for appears to have been for a just and honest purpose, for
> the protection of the legitimate interests of the party in whose favor it is imposed,
> reasonable as between them and not specifically injurious to the public, the restraint will
> be held valid.

*Hubbard v. Miller*, 27 Mich. App. 15, 1873 WL 5848 (1873)(quoted with approval by *Bristol*,

250 Mich. App. at 494-95).

Thus, the first question the Court must resolve is whether enforcement of the covenant is

16

necessary to protect Guardian's legitimate business interest. The Court concludes that it is not. Accordingly, there is no need to continue with the analysis of whether the covenant's two-year term and unlimited geographic restriction is reasonable (and, obviously, no occasion to apply judicial reformation to make unreasonable terms reasonable).

Whit Davis argues that the covenant in question protects no legitimate interest, but rather prohibits ordinary competition. Guardian counters that the covenant protects its substantial business investment. For the reasons stated below, the Court concludes that the covenant is unenforceable because it goes further than necessary to protect Guardian's legitimate business interest and unduly burdens competition.

The Court recognized early on that Guardian's covenant does not fit neatly into either of the two broad categories in which such covenants are frequently found – employment agreements and agreements made in connection with the sale of a business.  For that reason, the Court requested the parties to conduct additional research and attempt to find cases addressing covenants in situations similar to the case at bar.  The parties have been unable to find any case in which a manufacturer and distributor of product attempted to impose upon a purchaser of its product a restriction prohibiting that purchaser from installing any such product after the termination of the exclusive supplier contract.  This absence is telling and reinforces the Court's conclusion in this case.

Guardian argues strenuously that Whit Davis' reliance on employer-employee cases is improper and that such cases have no precedential value. The Court disagrees.   That this case is an anomaly does not mean that cases from other contexts, and the legal principles enunciated therein, are not useful.   Significantly, the context of the covenant here is more like the employer-

17

employee situation than that of a sale of a business.  A comparison of the two contexts reveals why.

The scope of permissible restrictions in covenants increases significantly when the sale of a business is involved.  Such sales typically involve a transaction in which the parties have negotiated for and established a price which includes the transfer of the seller's goodwill.  To protect the buyer's investment, a restrictive covenant frequently is necessary.   In essence, the buyer pays for the covenant when he buys the business.  The terms of the covenant are a material part of the agreement itself, typically arrived at following an arms-length negotiation process.

Guardian's covenant differs, and significantly so, from covenants associated with the sale of a business.  Whit Davis did not acquire access to Guardian's name (it was already selling its product at retail prior to entering into trial Agreement, its customers, any trade secrets or any goodwill in connection with being deemed an exclusive supplier of Guardian fiberglass insulation.   In fact, the opposite is true.  As a result of the contract, Guardian obtained access to Whit Davis' established customer base and good reputation in the industry.   Nor did Whit Davis acquire any trade secrets or confidential information from Guardian which would justify a post-termination restriction.[8]  Because the covenant here differs in such material respects from covenants in connection with the sale of a business, the Court finds that cases interpreting such covenants have very little, if any, precedential value.

The Court likewise rejects, for the same reason, Guardian's suggestion the covenant in this case is most similar to a covenant in a franchisor-franchisee situation and should be analyzed

---

[8]  It appears that Guardian's only proprietary information involved its computer and software, which Whit Davis did not seek to use following termination of the Agreement and which has been returned to Guardian.

18

as such.   In a franchise relationship, the franchisee pays a fee in return for which the franchisee

receives a business model and goodwill provided by the franchisor.  The franchisee ordinarily has

no existing customers and is looking to offset the start-up risks associated with start up

businesses by using a proven business model and/or a recognized brand or service mark.  The

franchisor has invested the funds and sweat equity necessary to create a successful business

model and goodwill in connection with the particular product or service.  *See Jiffy Lube*

*International Inc. v. Weiss Bros. Inc.*, 834 F.Supp. 683, 691 (D.N.J. 1993)(emphasizing that the

"primary characteristic of the franchise is the license given to the franchisee to trade upon and

exploit the franchisor's goodwill").  Thus, "a franchise agreement is analogous to a sale of

business for purposes of determining the enforceability of the posttermination covenant not to

compete."  *H&R Block Tax Service, Inc. v. Circle A Enterprises, Inc.*, 269 Neb. 411, 421, 693

N.W.2d 548, 557 (2005).

Guardian, relying on *H&R Block* and similar case law, contends that Whit Davis

resembles "a franchisee who sells a service (insulation installation) with the product supplied and

the methods prescribed by a franchisor (Guardian) who assists the franchisee with promotion and

various training and advisory services."   (Brief at p. 27, Doc. 41).  Guardian further contends

that Whit Davis can trade upon Guardian's reputation and exploit its goodwill.   Arguing its point

further, it contends:

> Guardian made a substantial investment in Whit Davis (discussed in more detail
> below) at the exclusion of other opportunities that allowed Defendant to establish
> and expand its installed insulation business to a level where it now controls a
> large segment of this industry in the central Arkansas market.

(Brief, at p. 27, Doc. 41).

But, Guardian lacks the "goodwill" typically conveyed by a franchisor to a franchisee. Guardian contends that it sold Whit Davis a "business in a box." Guardian overstates what it provided. To be sure, Guardian developed and packaged a business plan to attract and assist lumber yards selling insulation at retail to begin installing insulation. And Guardian no doubt provided significant support, particularly in the earlier years of the relationship, which enhanced Whit Davis' success and from which Guardian and Whit Davis both profited. But, Guardian ignores the significance of what Whit Davis provided – an established, significant customer base – the most critical platform from which to launch a new business. Guardian recognized the significance of Whit Davis' customer base when it pre-qualified as potential dealers only those dealers with a minimum number of new housing starts, thereby ensuring a base of customers to whom to sell insulation installation packages. This customer base likely contributed to Whit Davis' market growth and success far more than any assistance Guardian ever provided. A franchisor does not enjoy these advantages when it takes on a new franchisee.

It is important to keep in mind exactly what Guardian provided (and did not) in terms of its fiberglass insulation product. The evidence at the preliminary injunction hearing and on the summary judgment record (plus common sense) indicates that fiberglass insulation is a fungible commodity in the market. That is, customers are unlikely to choose a particular brand of insulation over another, to specify, for example, the use of blown fiberglass insulation manufactured by Guardian as opposed to Johns Manville or Owens Cornings. Most customers choose an insulation installer based on price, service and reputation and allow the installer to determine which brand of insulation to install. Thus, Guardian provided no market advantage based on name or brand recognition, as do many franchisors. In fact, in direct contrast to most

franchise agreements, Whit Davis was not permitted to use Guardian's name, or marks.

The situation here is more like that of joint venturers or business partners, with each contributing essential ingredients for a successful business model.  Guardian provided the idea or the seed (the start-up plan and incentives for Whit Davis to begin providing insulation installation services), Whit Davis provided fertile ground (an existing business and significant customer base) for planting the seed.  Both fertilized the seed and nourished the plant, it took root, and produced a sizable harvest.  The parties did the same thing for six years in a row, each reaping the benefits of the relationship.  Guardian contends that its contribution was so significant and so vital to the success of the operation that at any point in time Whit Davis elects to obtain insulation from another source, its ground must lay fallow for a two year period.

The Court cannot agree.

While the Court finds it appropriate to consider legal principles from the employer-employee line of cases, it does so recognizing that the typical concern regarding disparities in bargaining power between employers and employees is absent here.  Whit Davis is a successful company that has been in business for over 50 years.  Certainly, that Whit Davis voluntarily agreed to the restrictive covenant weighs in favor of enforcement more than if Whit Davis, as an employee, had agreed to the covenant.  However, Whit Davis' agreement to the covenant does not obviate the need for this Court to examine the restrictive covenant to ensure that it comports with the law.  Covenants of this nature are disfavored in the law and are likely to face legal scrutiny, as Guardian was no doubt aware when it included the provision.

Enforceable restrictions on employees are usually justified by the need to prevent the employee from using confidential information or trade secrets or from unfairly appropriating the

employer's customers.  Yet, here, no confidential information or trade secrets are involved.

Thus, the covenant cannot be justified by the assertion that it is necessary to protect misuse of

any confidential information, trade secrets, or customer information.  Not only is there no danger

that Whit Davis will misappropriate or interfere with Guardian's customers; rather, Guardian

seeks to interfere with or limit Whit Davis' relationship with its existing customers by

prohibiting Whit Davis from continuing to offer a service to them.  This distinction is important

and weighs heavily in favor of not enforcing the covenant.

It is, of course, well established that covenants which prohibit the use of general

knowledge or skills are not enforceable.  *Follmer, Rudzewicz & Co. PC v. Kosco*, 420 Mich.

394, 402-04, 362 N.W.2d 676 (1984).   And, thus, the covenant is inappropriate to the extent that

it seeks to prevent Whit Davis from using its general knowledge or skills regarding the

installation of insulation.  And, after all, the act of installing insulation is not a task that requires

specialized skill or in-depth training.  There is nothing in this record that suggests that Guardian

provided anything other than installation training of a general nature during the first week of the

parties' relationship.

Finally, in another sense, the employer-employee situation does not adequately portray

Whit Davis' investment and business risk.  That is, Whit Davis, even though it had more

bargaining power than a typical employee, incurred more risk than does a typical employee.

Whit Davis increased its operational costs to take on a new line of business.  Guardian

significantly offset this risk, particularly in the first year, by guaranteeing a 25% profit in year

one (which Whit Davis exceeded) and by its other cost sharing and rebate programs.  The growth

of Whit Davis' installation business over the six years it did business with Guardian likely

required Whit Davis to hire more employees and purchase more equipment.  While Guardian may have offered rebates and programs which would have offset a portion of such cost, Whit Davis, not Guardian, incurred the costs.  Enforcement of the covenant here will require Whit Davis, not Guardian, to forfeit that investment and to prohibit it from competing in the market to earn a return on its investment.  Such a forfeiture is analogous to restricting an employee's ability to work completely, which is rarely permitted.

Guardian contends that it made a "substantial investment" that was intended to create a long-term benefit of establishing a "competitive footprint in central Arkansas."  Guardian makes no effort to quantify its investment in Whit Davis and its mere assertion that it invested substantial amounts, without more, in no way alters the Court's conclusion.  In today's competitive business climate, money and effort are routinely invested with the hope of creating a long-term profitable relationship, but such investment does not justify imposing an unreasonable penalty on someone who elects to do business elsewhere. In any event, in reaching its conclusion in this case, the Court accepts Guardian's assertion that it made an unspecified "substantial investment" in doing business with Whit Davis.  The Court further accepts that Guardian contributed substantially to Whit Davis' ultimate success as an insulation installer.  Guardian realized a significant return on its investment, however, by the six years that Whit Davis continued in the relationship, generating a profit of approximately one million dollars for Guardian.  Perhaps the issue would be resolved differently if Whit Davis had failed to complete the Agreement's three year original term.  But, Whit Davis completed the initial three year term plus two more years.

Additionally, the Court finds it highly significant that Guardian, by enforcing the

covenant, seeks to obtain thereby what it could not obtain from the Agreement itself.  While the Agreement purports to permit any party to terminate it with 90 days' notice, by enforcement of the covenant, Whit Davis would never be free to terminate the Agreement without ceasing its installed insulation operation for two years.  Guardian, on the other hand, was free to cancel with ninety days' notice and walk away.  This arrangement would continue in perpetuity until Whit Davis suffered the penalty and ceased doing business for two years.  Guardian makes much of the fact that it treated Whit Davis fairly and always offered fair pricing, but this is not the point.  The law frowns on covenants not to compete, the purpose or effect of which are to prevent ordinary competition.  This covenant does just that.

Guardian repeatedly asserts that without enforcement of the covenant it has lost its "competitive footprint" in central Arkansas, but it appears that what Guardian has really lost is its protection from having to compete.  The covenant is not geared to protect Guardian from unfair competition, but is geared to protect Guardian from any competition in the central Arkansas market.  While this might well serve to protect Guardian's "competitive footprint" – in the process it would stiffle competition, unfairly burden Whit Davis, and deprive the public of a reliable and trusted service provider.

For all of the reasons stated herein and after considering the entire record in this case, the Court concludes that the covenant in question is unreasonable and unenforceable.  Guardian's post-termination covenant does not protect Guardian's legitimate business interest.   The Court additionally, and alternatively, finds that the hardship imposed on Whit Davis and the likely injury to the public if the covenant is enforced far outweighs any legitimate interest that Guardian might have in its enforcement.  *See, e.g.,* Restatement 2d of Contracts § 188.

### Whit Davis' Alleged Violation of the Exclusivity Provision

The Agreement provides that, the "[s]upplier is in the business of manufacturing, marketing and selling through authorized distributors fiberglass insulation products ("Insulation Products") to retailers and wholesalers."  The Agreement's Exclusive Supplier provision further provides that, "[d]uring the term of this Agreement, Customer agrees to exclusively stock and utilize Insulation Products manufactured by or for Supplier for both retail sales at the Designated Locations and for the provision of Installation services from the Designated Locations and to purchase such Insulation Products only from distributors authorized by Supplier."  (Agreement, Ex. 12, ¶ A and ¶ 3, Doc. No. 40).

Guardian contends that Whit Davis violated the Agreement's exclusivity provision by purchasing product from another supplier prior to expiration of the Agreement's ninety (90) day notice provision.  Whit Davis acknowledges that its action of purchasing fiberglass insulation from Johns Manville in January of 2004 violated the exclusive supplier provision if the provision is enforceable.  However, Whit Davis contends that the provision became unenforceable when Guardian agreed that Whit Davis could install cellulose insulation.

Guardian counters that the Agreement on its terms applies only to fiberglass insulation and may not have prevented the sale of cellulose insulation – a less expensive, paper-based, blown in product used as an alternative to Guardian's fiberglass-based UltraFit insulation. Alternatively, if Guardian's consent was required, Guardian contends that its mutual agreement to this specific and limited exception would not have been sufficient to modify the Agreement's original exclusivity provision. *Quality Products and Concepts Co. v. Nagel Precision, Inc.*, 469 Mich. 362, 364 (2003)(parties may mutually modify a contract by oral agreement or affirmative

conduct establishing mutual agreement to waive the terms of the original contract).

The Court agrees that Guardian has the better argument here.  On this record, there is no evidence that Guardian agreed to waive the exclusivity provision's requirement that Whit Davis confine its purchases of fiberglass insulation materials to Guardian or Guardian approved suppliers.   There is no issue of material fact on the issue of Whit Davis' liability for breaching the exclusive supplier provision.  Guardian is entitled to summary judgment on this issue.

## CONCLUSION

For the reasons herein stated,

IT IS HEREBY ORDERED THAT Defendants' Motion for Summary Judgment (Docket No. 31) be, and it is hereby, GRANTED.

IT IS FURTHER ORDERED THAT Plaintiff's Counter-Motion for Partial Summary Judgment (Docket No. 40) be, and it is hereby, DENIED IN PART AND GRANTED IN PART. The motion is granted solely to the extent that the Court finds that Whit Davis breached the Agreement's exclusivity provision.

IT IS FURTHER ORDERED, *sua sponte*, that the parties are directed to confer in light of the rulings herein and to advise the Court as to which outstanding discovery issues, if any, need to be resolved by the Court and how long the trial on the remaining damage issue is anticipated to last (and also provide a proposed trial date).  The Court directs the parties to file a joint submission, if said issues can be agreed upon, or, if not, to file simultaneous individual submissions not later than April 21, 2006.

IT IS SO ORDERED this __27th__ day of March, 2006.

_____/s/Garnett Thomas Eisele_____
UNITED STATES DISTRICT JUDGE